**INDIANA DEPARTMENT OF NATURAL RESOURCES,**
Appellant–Defendant,

v.

**LICK FORK MARINA, INC.**
Appellee–Plaintiff.

No. 19A05–0312–CV–654.

Court of Appeals of Indiana.

Jan. 6, 2005.

Steve Carter, Attorney General of Indiana, David L. Steiner, Deputy Attorney General, Janet L. Parsanko, Chief Counsel Indiana Department of Natural Resources, Attorneys for Appellant.

James C. Tucker, Tucker and Tucker, P.C., Paoli, IN, Attorney for Appellee.

## OPINION

BAKER, Judge.

Appellant-defendant Indiana Department of Natural Resources (DNR) appeals the trial court's judgment in favor of appellee-plaintiff Lick Fork Marina, Inc. (Lick Fork). Specifically, DNR raises two issues, one of which we find dispositive: whether the trial court erred in determining that DNR inversely condemned Lick Fork's property. Finding that no taking occurred, we reverse the judgment of the trial court and remand for proceedings consistent with this opinion.

### FACTS

The Patoka Lake Project is a joint reservoir project between the State of Indiana and the United States Department of the Army. Patoka Lake is located in Dubois, Orange and Crawford Counties. The Army Corp of Engineers manages the water storage and flood control aspects of the project, and DNR manages the recreation and wildlife activities aspects.

In 1979, the Army leased property adjacent to Patoka Lake to DNR "for public park and recreational and fish and wildlife management purposes." Appellant's App. p. 39. The federal lease allows DNR to enter into subleases to assist DNR in carrying out its responsibilities under the lease. The federal lease requires that all subleases "shall state that they are granted subject to the provisions of this lease." Appellant's App. p. 41.

Pursuant to the federal lease, DNR sought proposals for a contractual agreement for the construction and operation of a marina on Patoka Lake through a competitive bidding process. DNR issued a "Prospectus for Marina and Related Facilities" (Prospectus) in 1979 to elicit the proposals. The Prospectus advised potential candidates that an executed lease would

constitute a "contract between the state of Indiana and the lessee." Hearing Ex. 7. The Prospectus also stated that the successful candidate was required to "finance, build and maintain" a slip dock facility with electricity and water on the docks, a minimum one hundred buoy rental facility, a service dock, an office building, and a service operation building.

Martin Fallon (Martin) submitted a proposal to build, operate and maintain the marina at the Lick Fork site on Patoka Lake. He affirmed that he was familiar with the business of operating such facilities and estimated that it would cost $100,000 to provide the proposed services in the first year. DNR selected Martin's proposal, and on April 29, 1980, the parties executed a lease agreement (Lease) with Lick Fork, with Martin signing on behalf of Lick Fork.

The Lease provided that Lick Fork would pay $3,000 per year in rent, which equates to $250 per month, plus small percentages of the gross income derived from boat sales, boat rental, gas sales, and other business operations conducted on the leased premises. Lick Fork retained 90 to 99 percent of the income generated at the facility, depending on the item from which the income was derived. The Lease further stated:

> *Title to Property.* Title to any and all buildings, structures and other improvements erected or placed on the Leased Real Estate by the Lessee, which are so permanently fixed to the real estate as to become legally a part of the real estate is vested in the United States of America and is leased to the Lessor under the lease attached hereto and marked Exhibit A. All other property placed or erected on the Leased Real Estate by the Lessee shall belong to the Lessee.

Appellant's App. p. 33. The Lease provided for a ten-year term beginning April 29, 1980, and ending on April 28, 1990. Lick Fork agreed to "design, construct, and maintain the facilities described in the proposal." Appellant's App. p. 20. Lick Fork made numerous improvements to the leasehold, including: docks, above-ground tanks, temporary buildings such as storage trailers and sheds, mobile equipment, inventory and supply items. Lick Fork also constructed on the leasehold a marina building, radio tower, birdhouse poles, wire propane pen, a gazebo, an octagonal wood deck, landscaping, established concrete ramps and cement work, pads and stairs, utilities and accessories leading to various docks, in-ground fuel storage with all attachments, mechanical in-ground improvements, utility lines, and rip-rap.[1] Pursuant to the Lease, Lick Fork paid property taxes on all these items.

The Lease also permitted Lick Fork to renew the Lease for two additional five-year terms on the same terms and conditions as the original lease, provided the facility had been maintained in a satisfactory condition and that customer service had been of satisfactory quality to DNR. Martin renewed the Lease in 1990. Bernard Fallon (Fallon), Martin's son, renewed the lease in 1995. DNR received complaints about the marina after Fallon began to operate it. DNR discussed those situations with Bernard and sent letters to him on some occasions.

At the expiration of the lease, Lick Fork did not vacate the property. Under the terms of the Lease, Lick Fork began to

---

1. According to the *Oxford English Dictionary,* second edition, rip-rap is "[l]oose stone thrown down in water or on a soft bottom to form a foundation for a breakwater or other work. More widely, loose stone used for revetments, embankments, or the like; also, a structure made of this."

occupy the premises as a tenant from month to month. DNR allowed Fallon to remain on the property for nearly a year after the expiration of the Lease.

In December 1999, four months prior to the expiration of the Lease, DNR issued a "Prospectus and Statement of Intent for the Operation of the Lick Fork Marina and Houseboat Concession" to elicit proposals for operation of the marina. Fallon submitted a proposal, as did Jeff and Shellie Dukes.

On October 9, 2000, counsel for Lick Fork wrote a letter to DNR explaining Lick Fork's position that all improvements to the real estate were the property of Lick Fork and not a part of the real estate. The letter cautioned:

> If Lick Fork Marina, Inc. is the successful offeror, there is no problem. If Mr. Dukes is the successful offeror and Lick Fork Marina, Inc. enters into an agreement of sale, there is no problem. Otherwise, the improvements which can be removed without injury to the real estate will be removed by Lick Fork Marina, Inc. prior to the end of the month-to-month lease.

Appellant's App. p. 56. On January 18, 2001, counsel for Lick Fork wrote another letter to DNR, stating:

> The bottom line is that the State certainly has the right to allow whomever it chooses to operate a marina at Lick Fork of Patoka Lake. If the State chooses Glen Dukes, then the Fallon family has a right to remove the improvements that is [sic] installed, for so long as it restores the real estate to the condition it was before it began its lease.

Appellant's App. p. 59. DNR ultimately awarded the new lease to Hoosier Hills Marina, Inc., owned and operated by Jeff and Shellie Dukes. On February 6, 2001, DNR gave notice to Fallon to vacate the premises no later than March 31, 2001.

The notice stated, in part, "All personal property is to be removed by that date; any personal property remaining thereafter shall become the property of the State of Indiana." Appellant's App. p. 60.

On February 23, 2001, counsel for DNR sent a letter to Lick Fork stating its opinion that "the marina building, landscaping, concrete ramps or cement work, pads and stairs, utilities and accessories leading to various docks, in-ground fuel storage with all attachments, utility lines and rip-rap are not personal property. . . ." Appellant's App. p. 61. DNR concluded that these items were considered to be the State's property and could not be removed. DNR further instructed Lick Fork to remove items of personal property on or before March 31, 2001.

On April 19, 2001, Lick Fork filed a complaint against DNR entitled, "Complaint in Inverse Condemnation," and the trial court treated the case as one arising under Indiana's eminent domain statutes. Appellant's App. p. 8. DNR maintained that Lick Fork did not own the property in question and that the dispute regarding the Lease must be handled through application of contract law. On August 30, 2001, the trial court conducted a hearing to determine whether there had been a taking. The trial court adopted Lick Fork's proposed findings of fact and conclusions of law, thereby ruling that DNR acquired property belonging to Lick Fork without compensation.

DNR filed a motion to reconsider on November 30, 2001, alleging that this was a lease dispute rather than an inverse condemnation case. On January 9, 2002, the trial court denied the motion to reconsider without additional findings or commentary. On May 30, 2002, the trial court appointed three appraisers—Chuck Pund, Doug Hulsman and Steve Woerner—to determine the amount of compensation owed

Lick Fork. They were instructed to assess the value of the property—including the marina building, landscaping, concrete ramps, utilities, rip-rap and in-ground fuel storage—less the cost to remove the items and restore the property.

The jury trial to determine compensation commenced on August 20, 2003. The three court-appointed appraisers determined that the amount of compensation due was $374,800. David Miller, another expert appraiser, testified that just compensation was $461,240. At the conclusion of the trial, the jury rendered a verdict against DNR in the amount of $432,600. The trial court entered judgment against DNR "in the sum of $515,469.57, together with interest thereon from August 22, 2003 until paid at a rate of 8% per annum, together with costs." Appellant's App. p. 194. DNR filed a motion to correct error, again arguing that this case should have been decided based on contract law rather than Indiana's eminent domain statutes. The trial court denied the motion to correct error on October 31, 2003, and DNR now appeals.

### DISCUSSION AND DECISION

DNR argues that the trial court erred in finding that DNR effectuated a taking. Specifically, DNR contends that this case should have been decided under principles of contract law and not eminent domain law, and that under the contract, the property in question did not belong to Lick Fork.

■ Initially, we note that Lick Fork raises the argument that DNR has waived the right to bring this issue on appeal by failing to bring it as an interlocutory appeal. However, the State does not have the right to an interlocutory appeal in an inverse condemnation case. *Evansville–Vanderburgh Levee Auth. v. Towne Motel, Inc.*, 247 Ind. 161, 162–63, 213 N.E.2d 705, 706 (1966). In an eminent domain case,

the landowner may bring an interlocutory appeal "since irreparable damage would otherwise be done to a landowner whose property might illegally be seized and destroyed and he be left only to a money judgment if the proceedings were to continue thereafter on the issue only of what was the monetary loss." *Id.* But in an inverse condemnation case, the public body "has already seized the land and ... the defendant is seeking only his compensation." *Id.* The State will not be irreparably harmed without an interlocutory appeal, and its remedy in such cases lies in an appeal after the final judgment. *Id.* Thus, DNR has not waived its right to raise this issue before us.

■ Turning to the merits of the case, we note that we will set aside the trial court's findings of fact and conclusions of law if they are clearly erroneous. Ind. Trial Rule 52(A). When a trial court has entered findings of fact and conclusions of law, its judgment is clearly erroneous only if its findings of fact do not support its conclusions of law, or its conclusions of law do not support its judgment. *Lloyd v. Lloyd*, 755 N.E.2d 1165, 1167 (Ind.Ct.App. 2001). Findings are clearly erroneous when the record contains no facts to support them either directly or by inference. *Id.*

■ Where the State takes private property for public use, "a landowner is entitled to just compensation—not a windfall" at the expense of the public. *Bayh v. Sonnenburg*, 573 N.E.2d 398, 421 (Ind. 1991). Where there is no taking, a party is not entitled to any compensation. *State v. Bishop*, 800 N.E.2d 918, 926 (Ind.2003).

■ A fixture is "[p]ersonal property that is attached to land or a building and that is regarded as an irremovable part of the real property." *Black's Law Dictionary* 652 (7th ed.1999). The Lease stated, "Title to any and all ... improvements ... placed on the Leased Real Estate by the

Lessee, which are so permanently fixed to the real estate as to become legally a part of the real estate is vested in the United States of America and is leased to the Lessor...." Appellant's App. p. 33. Thus, the Lease demonstrates that the parties intended for any fixtures placed on the property to be a part of the real estate and not personal property that could be removed by Lick Fork; real estate and fixtures were to be property of the government. Quintessential examples of fixtures include things such as the marina building, underground storage tanks, landscaping and concrete ramps. They are not rendered personal property simply because it is possible to remove them with bulldozers and large machinery. Therefore, no taking occurred, and this case is one that should have been decided under principles of contract law.

We therefore turn to the question of whether there was a violation of the Lease contract. Because a lease is a contract, the essence of the landlord-tenant relationship is contractual in nature. *Schuman v. Kobets*, 716 N.E.2d 355, 356 (Ind. 1999). When the terms of a contract are clear and unambiguous, those terms are conclusive, and the court will not construe the contract or look at extrinsic evidence but rather will simply apply the contract provisions. *Stout v. Kokomo Manor Apartments*, 677 N.E.2d 1060, 1064 (Ind. Ct.App.1997). When interpreting a contract, a court must ascertain and effectuate the intent of the parties. *Samar, Inc. v. Hofferth*, 726 N.E.2d 1286, 1290 (Ind.Ct. App.2000), *trans. denied.* The contract must be read as a whole and the language construed so as not to render any words, phrases, or terms ineffective or meaningless. *Id.*

The Lease required Lick Fork to "design, construct, and maintain the facilities" described in the Prospectus. Hearing Ex. 7, p. 8. To be sure, Martin's proposal stated that during the first year of the lease, he intended to "finance, build, and maintain" an approved service dock, rental boat slip, and buoy rental facility. Appellant's App. p. 48. In consideration, DNR allowed Lick Fork to use the lakefront property without purchasing it and with low rental payments. Lick Fork also retained 90 to 99 percent of the income generated at the facility; the revenue generated by the facility sometimes approached $600,000 per year. Tr. p. p. 294. DNR also benefited from the Lease, as it provided a means for DNR to make resources and recreational opportunities available to the public without expending public funds.

This contract was mutually beneficial to the parties. And Martin Fallon was familiar with the business of operating marina facilities and the laws regulating their operation. Appellant's App. p. 50. Moreover, Martin had former experience in similar enterprises and had been involved in the construction and operation of similar facilities for several years. *Id.* at 51. Thus, it can be said that when he signed the lease on behalf of Lick Fork, he understood the financial implications of the Lease. The contract unambiguously states that fixtures are property of the government and not of Lick Fork. Appellant's App. p. 33. And we must give effect to the intent of the parties in agreeing to this provision. Therefore, we find that any fixtures on the real estate were not the property of Lick Fork, and Lick Fork is not entitled to compensation.

The judgment of the trial court is reversed and remanded for proceedings consistent with this opinion.

SHARPNACK, J., and FRIEDLANDER, J., concur.